UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

David and Toni Deaton,    Case No.: 14-50878
                          Chapter 13
    Debtor.               Hon. Walter Shapero
_____/

Stephen J. Vondra,

    Plaintiff,

v.                        Adversary Proceeding
                          Case No.: 14-05050

David Deaton,

    Defendant.
_____/

## OPINION REGARDING DISCHARGEABILITY OF DEBT

**I.     INTRODUCTION**

David and Toni Deaton filed for chapter 7 relief on June 30, 2014. Prior to the bankruptcy filing, Steven Vondra had filed an action against David Deaton in the Oakland County Circuit Court alleging a claim of intentional and malicious tortious action. The lawsuit stemmed from an incident on January 24, 2011, whereby David Deaton shot Steven Vondra. The state court action was stayed prior to any determination of liability.

On October 6, 2014, Steven Vondra filed this adversary proceeding seeking a determination of damages against David Deaton and a finding that the debt is nondischargeable under 11 U.S.C. § 523(a)(6). The Court conducted a trial on December 9, 2015, and took the matter under advisement.

## II. EVIDENCE and TESTIMONY

At the time of the shooting, Steven Vondra and his family (his wife, Kelly, and their three children) lived next-door to David Deaton's mother in Rochester Hills. David Deaton lived in Rochester, approximately one mile away. The Vondra house was located very close to the lot line next to the Deaton property. The Vondras believed it to be about 5 feet from the lot line; David Deaton believed it to be less than one inch from the lot line. It was also very close to Mrs. Deaton's driveway. Due to the proximity of the Vondra's house to Mrs. Deaton's property, there had been some animosity over the years. For example, Steven Vondra stated that snow had been plowed up against his house from Mrs. Deaton's driveway. David Deaton testified that the Vondras used his mother's driveway to take their trash to the curb.

On the day of the shooting, Steven Vondra's son had left the Vondras' snow blower on Mrs. Deaton's property. At approximately 1:00 p.m., David Deaton stopped by his mother's house to see if her driveway needed to be cleared of snow. He parked his GMC Jimmy in her driveway and proceeded to the Vondras' house to request that the Vondras' snow blower be moved off of his mother's property. What transpired next is in dispute.

Kelly Vondra testified that, upon hearing a loud pounding on the door, she answered the door and was confronted by David Deaton who demanded that the Vondras' snow blower be removed from his mother's property. She agreed to move the snow blower and proceeded to put on her coat and boots. She went outside to where the snow blower had been. When she got outside, she discovered that the snow blower had been moved farther onto Mrs. Deaton's property. She approached the snow blower, grabbed the handle and began to pull the snow blower toward her house. However, David Deaton stepped in her way and would not allow her to take the snow blower.

She and David Deaton exchanged a few words. At this point, Steven Vondra came outside and Kelly retreated to her yard. According to Kelly, Steven Vondra and David Deaton began arguing about the property line and David Deaton pulled out a can of pepper spray and sprayed it towards Steven Vondra's face. David Deaton sprayed Steven Vondra several times with the pepper spray, prompting Steven Vondra to reach out and grab David Deaton's hand. David Deaton backed up and tripped over some bushes next to his mother's driveway. Steven Vondra then turned and began walking toward the Vondras' house. At that point, David Deaton shot Steven Vondra in the buttocks. Steven Vondra was approximately 10 feet from David Deaton when he was shot. Kelly Vondra testified that she never saw Steven Vondra hit David Deaton, nor did she see David Deaton hit Steven Vondra.

Steven Vondra testified that approximately 5 minutes after Kelly went outside to retrieve the snow blower, he went outside to investigate. He asked Kelly what was going on and she said that David Deaton would not give her the snow blower. Steven Vondra attempted to retrieve the snow blower himself, but David Deaton yanked it away from him. David Deaton then sprayed pepper spray at Steven Vondra's face. David Deaton sprayed Steven Vondra a second time and stated, "if you don't like that, I have something else for you." As David Deaton was trying to spray Steven Vondra a third time, Steven reached out and grabbed Deaton's hand, attempting to take the pepper spray from him. During this struggle, Kelly retrieved the snow blower and pulled it into the Vondras' yard. David Deaton stepped back and fell over a bush. Once David Deaton was on the ground, Steven Vondra turned and began walking towards his house. As he was walking, he heard a pop and felt a sharp pain in his lower back causing him to fall to the ground. Steven Vondra stated that he was approximately 10-12 feet from David Deaton when he was shot. Steven Vondra testified that he never hit David Deaton and Deaton never hit him.

David Deaton testified that upon seeing the snow blower on his mother's property, he proceeded to the Vondras' house and knocked on the front door. Kelly Vondra answered the door and he asked her to move the snow blower. Kelly Vondra told him it was on her property. He then told her that if it was not moved, he would take it to the police station and she could pick it up there. However, he claims that he did not move the snow blower farther onto his mother's property. Deaton testified that both Kelly and Steven proceeded outside. Kelly followed Deaton towards his truck while pulling the snow blower behind her and would not let him leave. He asked her to move and she refused. Steven had gone back into the house and was watching out the window. At some point, Steven came back outside and lunged at Deaton. Deaton sprayed him with pepper spray. Steven lunged at him again so Deaton sprayed him again and told him that if that doesn't stop him, he has something that will. Steven then grabbed Deaton's hand that was holding the pepper spray and punched Deaton in the jaw, knocking him to the ground. As he was falling, Deaton pulled out his gun and hit Steven in the head with it. After falling, Deaton rolled over and shot Steven because he felt that he was in danger. Deaton testified that Steven was not walking away when Deaton shot him. However, Steven turned when he saw the gun, resulting in him being shot in the buttocks. Deaton testified that he never believed that Steven was trying to kill him or that Steven ever used deadly force against him. However, Deaton felt that he was justified in using deadly force against Steven because Steven punched him and escalated the situation.

After the shooting, Deaton waited at the end of his mother's driveway for officers to arrive. Steven Vondra was taken to Pontiac Osteopathic Hospital. According to the Vondras' testimony and medical records, the bullet severed the main return vein from Steven's leg and nicked his rectum. The surgeon performed a colostomy to prevent infection. Steven was put into a medically

induced coma and developed deep vein thrombosis ("DVT") in his right leg. Several medical procedures were required to treat the DVT. Steven testified that he now has no feeling in the toes of his right foot, cannot move his right ankle, and has no feeling from the center of his shin to his toes. He developed a large bed sore while in the hospital as well. Steven did not have health insurance at the time of the shooting and stated that charges from Pontiac Osteopathic Hospital were in excess of $318,000. Additionally, he has incurred other out of pocket charges that he estimates to be $10,000. At the time of the shooting, Steven Vondra had been unemployed since April of 2009. However, he was actively looking for work and was receiving unemployment. At his previous job, he made $23.00 per hour. With overtime, he grossed approximately $93,000 annually. He is now on medical disability and receives $2,027 per month.

Steven Vondra testified that he believes the shooting has affected his relationship with his wife and kids. He stated that he suffers from depression and PTSD. He stated that his quality of life is diminished as he suffers ongoing pain and is unable to do many of the things he used to do, such as gardening. Steven Vondra has a personal protection order against David Deaton, but he is still fearful when he walks to his mailbox.

Kelly Vondra testified that of the hospital charges, $72,322.42 was paid by medicare and the rest was written off by the hospital. She stated that Steven Vondra has had anger issues and depression since the shooting.

## III. DISCUSSION

Exceptions to discharge are narrowly construed in favor of the debtor "to promote the central purpose of the discharge: relief for the honest but unfortunate debtor." *Meyers v. I.R.S.* (*In re*

*Meyers*), 196 F.3d 622, 624 (6th Cir. 1999) (quotation and citation omitted). The creditor bears the burden of proving by a preponderance of the evidence that the debt owed to it is non-dischargeable. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). 11 U.S.C. § 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." "From the plain language of the statute, the [debt] must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 463 (6th Cir. 1999). In *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), the Supreme Court determined the scope of the "willful" and "malicious" injury. In holding that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)," the Supreme Court explained that the "word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. at 61, 64.

In *Markowitz*, the Sixth Circuit elaborated on this definition, holding that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." 190 F.3d at 464 (internal citations omitted). Thus, "[i]n order to find a 'willful' injury under § 523(a)(6), [the Court] must determine either that (i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result form the act." *Monsanto Co. v. Trantham*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004).

The second component of § 523(a)(6) requires that the injury be "malicious." The word "'[m]alicious' means in conscious disregard of one's duties or without just cause or excuse; it does

not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). "[T]he definition of malice requires a heightened level of culpability transcending mere willfulness." *Superior Metal Prods. v. Martin* (*In re Martin*), 321 B.R. 437, 442 (Bankr. N.D. Ohio 2004).

It is undisputed from Deaton's testimony that he intended to shoot Steven Vondra and cause his injury. However, Deaton contends that the injury was not malicious because Deaton was acting in self-defense.

Self-defense can constitute a justifiable excuse for a defendant's actions and negate a claim of malice under § 523(a)(6). *Kleman v. Taylor* (*In re Taylor*), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004). Since it is an affirmative defense, the debtor bears the burden of proving the elements of self-defense. *Id*.

Federal law generally controls the standard for nondischargeability under § 523(a)(6), as well as the defenses. *Graffice v. Grim* (*In re Grim*), 293 B.R. 156, 167 (Bankr. N.D. Ohio 2003). However, state law can provide guidance on the issue of self-defense as it applies to § 523(a)(6). *Juett v. Casciano* (*In re Casciano*), No. 15-8013, 2016 WL 105926, at *6 (B.A.P. 6th Cir. Jan. 11, 2016); *see also Semler v. Semler* (*In re Semler*), 147 B.R. 137, 139 (Bankr. N.D. Ohio 1992) (although federal law controls dischargeability determinations, state law can provide guidance); *Sustache v. Matthews* (*In re Mathews*), 433 B.R. 732, 735 (Bankr. E.D. Wis.2010) (analyzing self-defense under state law noting authority on federal common law self-defense is sparse and requires guidance from state law on the issue).

The Michigan Self Defense Act provides, in relevant part:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force

> against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
>> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Mich. Comp. Laws Ann. § 780.972 (West).

A person who uses excessive force does not act in justifiable self-defense. *People v. Dupree*, 788 N.W.2d 399 (Mich. 2010).

Deaton testified that he did not believe that Steven Vondra was trying to kill him. He also testified that Steven Vondra never used deadly force against him. Deaton's justification for shooting Steven Vondra was that Steven Vondra punched him and he felt he was in danger. Vondra denied punching Deaton, however, even if Vondra did punch him the Court does not consider that a justification for the use of deadly force. Further, although Deaton never testified that he believed the use of deadly force was necessary to prevent imminent great bodily harm, even if he had, the Court would not find such belief reasonable. Reasonableness depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor. *People v. Doss*, 276 N.W.2d 9 (Mich. 1979). Factors relevant to whether a person in Deaton's position could have an honest and reasonable fear of serious bodily harm include: (1) the condition of the people involved, including their relative strength; (2) whether the other person was armed with a dangerous weapon or had some other means of injuring the defendant; (3) the nature of the other person's attack or threat; and (4) whether the defendant knew about any previous violent acts or threats made by the other person. *People v. Goree*, 819 N.W.2d 82 (Mich. App. 2012).

-8-

14-05050-mlo    Doc 28    Filed 06/07/16    Entered 06/08/16 08:02:40    Page 8 of 10

Deaton testified that he was recovering from infections on his feet, which may have impacted his ability to defend himself. The evidence showed that Steven Vondra weighed approximately 50 pounds more than Deaton. Deaton testified that Vondra lunged at him and punched him. However, Vondra did not have a weapon and there was no evidence of any previous violent acts or threats made by Vondra. Under the circumstances, the Court cannot find that a reasonable person would believe it necessary to use deadly force. The Court therefore concludes that Deaton used excessive force and his actions were not justified.

Accordingly, the Court finds that Deaton acted without just cause and therefore the debt arising from the injury is nondischargeable under § 523(a)(6).

Given the decision on dischargeability, it falls to the Court to determine the amount of damages to be awarded the Plaintiff. Having carefully reviewed the record on that issue, the Court has preliminarily concluded that the record is so inadequate and deficient with reference to affirmative proofs of damages or any evidentiary facts in opposition to same (such normally involving expert testimony which was lacking here), as well as associated legal arguments, that a reasoned decision thereon, while possible, would fall woefully and impermissibly short of doing justice to the issues and the parties. Accordingly, the Court will be doing the following: (1) appointing a mediator to work with the parties to see if they can resolve the question of damages; and (2) if the mediation is not successful, either decide the question of damages on the basis of the inadequate existing record and appropriate burdens of proof requirements, or, at the Court's discretion and in lieu thereof, set a supplementary evidentiary hearing solely on the damages issue.

The Court will issue appropriate orders.

**Signed on June 07, 2016**

                                         **/s/ Walter Shapero**
                                         **Walter Shapero**
                                         **United States Bankruptcy Judge**